Weisendanger v. Lind.

---

No. 24,264.

J. J. WEISENDANGER, *Appellant,* v. WILLIAM LIND, *Appellee.*

SYLLABUS BY THE COURT.

1. PROMISSORY NOTE—*Negotiated in Violation of the "Blue Sky" Law—Instructions.* An instruction that if the promotion and sale of units of a certain oil-lease royalty was a sale of speculative securities within the meaning of the "blue sky" statute the consideration for a note given in payment therefor was illegal, is held not to have been misleading, because the elements of lack of a permit and of the sale being made in the course of a scheme of promotion were supplied elsewhere in the charge, and under the evidence it was clear that no permit for the sale had been granted and that the sale was part of a promotion scheme.

2. SAME—*Note Given in Violation of "Blue Sky" Law—Innocent Holder—Burden of Proof.* In an action on a note given for securities sold in violation of the "blue sky" law, the consideration being for that reason illegal, the burden is on the plaintiff to prove that he, or some person under whom he claims, acquired the title as an owner in due course.

3. SAME—*Instruction.* In giving an instruction that a plaintiff who derives title to a note, the consideration for which was illegal, from one who was himself a holder in due course can derive no benefit from that fact if he was himself "a party to the illegality," it is not error to omit a definition of the quoted phrase when none is requested.

4. SAME—*Violation of "Blue Sky" Law—Party to the Illegality.* One who assists another in making a sale of securities requiring a permit under the "blue sky" law, which has not been granted, is not saved from being "a party to the illegality" by the fact that he does not know whether or not a permit had been obtained.

5. SAME—*Finding as to Plaintiff's Knowledge.* Where to a question whether the plaintiff knew when he purchased a note that the "blue sky" law had been violated in making the sale for which it had been given, the jury say: "No, not from the evidence," the answer under the facts presented may be interpreted as meaning that he did not know of the provision of the statute or that he did not know that no permit for such sale had been obtained.

6. SAME—*Findings of the Jury Interpreted.* Findings that the jury did not know whether a note was endorsed to a holder before maturity, but that he received it after maturity, may be reconciled by interpreting them to mean that the words of the indorsement were written on the note before it was due but the negotiation was not completed by delivery until after that time.

7. SAME—*Finding that Plaintiff Assisted in Making Illegal Sale of Securities in Violation of Law.* The evidence is held to sustain findings that the plaintiff assisted in making the sale of securities in payment for which the note sued on was given, and that he did so as a matter of business and not gratuitously.

Appeal from Riley district court; FRED R. SMITH, judge. Opinion filed November 10, 1923. Affirmed.

*R. P. Evans, George Clammer,* both of Manhattan, and *David Ritchie,* of Salina, for the appellant.

*Hal E. Harlan,* and *A. M. Johnston,* both of Manhattan, for the appellee.

The opinion of the court was delivered by

MASON, J.: J. J. Weisendanger sued William Lind upon a promissory note for $4,100. Judgment was rendered in favor of the defendant, and the plaintiff appeals.

The following is a summary of the transactions out of which the note grew: On June 7, 1919, Lind bought of Krouse and Thompson an interest (of which they were the equitable owners, the legal title being in S. F. Stewart) in the royalty provided for in an oil and gas lease, giving them for it a note for $4,000, due in 90 days. This note was assigned by the payees to Stewart, the assignment being made

Weisendanger v. Lind.

as security for an existing debt. Lind executed to Stewart a renewal
note dated November 25, 1919, due in six months. Through negotia-
tions with Thompson Weisendanger purchased this note. On May
20, 1920, by agreement of Weisendanger and Lind the time of pay-
ment was extended for a year, a new note (that here sued upon)
being executed, $100 being added to the principal as accrued interest.

1. The defense to the note was that the plaintiff was not a holder
in due course and that the original note on which it was based was
given for an illegal consideration in that the royalty interest referred
to was of a character forbidden to be sold without a permit under the
"blue sky" law, which was not obtained. The judgment involves
a decision against the plaintiff on both propositions. With respect
to the second the only ruling complained of was the giving of this
instruction, after a full statement of the pertinent parts of the
statute (Laws 1915, ch. 164; Laws 1919, ch. 153):

"You are therefore instructed in this case that if you shall find and believe
from the evidence by a preponderance thereof, that the promotion and sale
of the units of Fawley Royalty was a sale of speculative securities, within the
meaning of said act, then and in that event I instruct you that the considera-
tion for a promissory note given in payment for said units of Fawley Royalty
would be illegal, and that illegality of consideration is a complete defense as
against the original payee of said note, or as against any person not a holder
in due course."

The objection made to the instruction is its omission to specify
as elements necessary to render the note invalid the nonexistence
of a permit to sell and the making of the sale by one who was not
within the excepted class of whom no permit was required. Tech-
nical accuracy of expression required some such change in the lan-
guage as the insertion of the word "forbidden" before the phrase
"sale of securities," but obviously the intended meaning was the
same as though that change had been made and the jury in all
probability understood it in that way. The specific purpose of the
instruction was not to tell the jury what made a sale of securities
illegal (for that had already been covered), but what effect its
illegality would have upon the validity of the note. The use of the
word "therefore" shows that no modification of the statutory re-
quirements was intended, and the immediately preceding instruc-
tions quoted this provision of the act (Laws 1919, ch. 153, § 5):

. "This act shall not apply to the owner of any speculative security who is
not the maker or issuer thereof, who shall acquire and sell the same for his
own account in the usual and ordinary course of business, and not for the

direct or indirect promotion of any enterprise or scheme within the purview of this act: *Providing,* That such ownership is in good faith. Repeated or successive sales of any such speculative security or securities shall be *prima facie* evidence that the claim of ownership is not *bona fide,* or is a mere shift or device to evade the provisions of this act."

Moreover there is no suggestion that in fact a permit for the sale of interests in the royalty had been granted, and under the evidence there is hardly room for a serious doubt that the sale was a part of a promotion scheme.

2. The plaintiff contends that a demurrer to the defendant's evidence should have been sustained, saying in his brief:

"Certainly the burden being upon the defendant, it was incumbent upon him in this regard to show 'actual knowledge or factual knowledge' concerning the facts constituting illegality. These facts would be: first, that the securities were such as could not be sold without procuring of a permit; second, that no permit had been procured. Of course all the parties realized the nature of these securities, but there is not one syllable of testimony even tending to indicate that any party to this transaction, as shown by the testimony of the defense, at which this demurrer was directed, had any intimation whatever with regard to whether a permit to sell had or had not been obtained."

The fact having been established that the note was given for securities requiring a permit for their sale, which had not been obtained, the title of the payee was defective (Merriam v. West, 114 Kan. 131, 216 Pac. 1102) and the burden was on the plaintiff to show that he, or some person through whom he claimed, had acquired title as a holder in due course. (Gen. Stat. 1915, § 6586.) In that situation it could not be error to overrule a demurrer based on lack of evidence on the part of the defendant with respect to whether the plaintiff was a holder in due course.

3. The plaintiff claimed the rights of an innocent purchaser not only because he bought the note without notice of any defect, but also because he acquired title through Stewart, who was himself a holder in due course. The defendant, while denying that Stewart was such a holder, contended that even if that were the case it would not avail the plaintiff because he was "himself a party to . . . illegality affecting the instrument." (Gen. Stat. 1915, § 6585.) In this connection complaint is made that although the jury were instructed as to the effect of the statute just cited, and given a definition of "illegality of consideration" as applied to the facts of the case, the court omitted to define the phrase "party to the illegality."

We think the meaning of the phrase is clear enough to prevent the omission to define it from constituting error, in the absence of a request for a definition.

4. The only request of the plaintiff for an instruction in any way bearing upon the matter reads as follows:

"You are instructed that if you find from the evidence and believe that at the time the units of Fawley royalty were sold to the defendant that the act of sale was in violation of the law, yet you are instructed that that fact cannot constitute a defense to this note unless you further find and believe from the evidence that the plaintiff knew at the time that the original note was executed to Thompson & Krouse or that he learned prior to his acquisition of the renewal note that the law had been violated."

This language was likely to be understood by the jury as meaning, and in the light of the language of the plaintiff's brief, elsewhere quoted, was probably intended to mean, that the plaintiff, although he knew the securities for which the original note was given, could not be lawfully sold without a permit, could not be deprived of the rights of an innocent holder unless he also knew that no permit had been granted. That might be true in some cases, but here the defendant was claiming that the plaintiff was not merely cognizant of the illegality, but a party to it, and the jury found specifically that the plaintiff was an agent of Thompson & Krouse in the sale of the royalty interest to the defendant. If he participated in the making of the sale he could not be exonerated from even criminal liability merely because he did not know that no permit to sell had been obtained. If an agent in making or helping to make an illegal sale were protected from punishment by lack of personal knowledge of his principal's want of legal authority, the evasion of the statute would be so easy as to deprive it of much of its practical effect. An employee who makes a sale of intoxicating liquor, illegal because his employer has no license, cannot make a successful defense on the ground that he did not know such a license had not been granted. (*State v. Chastain,* 19 Ore. 176; *Tardiff v. The State,* 23 Tex. 169.)

The requested instruction is also open to the objection that the jury might have understood from it that the defendant, to defeat the plaintiff's claim of being a holder in due course, was required to show that he knew of the existence and provisions of the "blue sky" statute. The plaintiff says in his brief:

"There is not a syllable in the entire testimony that indicates that any of the parties at any time concerned about the events of this action had any idea

that a permit was necessary. While of course such ignorance of the law did not excuse a violation of it, if any existed, and it might be assumed for that reason that it was known that a permit was required, yet there is no syllable of direct or circumstantial evidence which indicates that Weisendanger knew or had any reason to suspect that a permit had not been issued. The fact is one of two facts lying at the basis of illegality, which either must be found against Weisendanger or this defense must be held unavailing."

5. The jury found that the consideration for the original note was illegal and that the plaintiff was a party to the illegality. To the question, "If you find from the evidence that the sale of Fawley royalty to the defendant was in violation of the law, then state whether you further find from the evidence that the plaintiff, at the time he purchased the note sued upon, knew of such violation," the jury answered, "No, not from the evidence." The plaintiff contends that this answer is inconsistent with the finding that he was a party to the illegality and with the general verdict. The form of the answer suggests that the jury meant that they did not find "from the evidence" that the plaintiff knew of the statute requiring a permit for the sale of such securities, but that they treated him as having knowledge of it on the presumption that every one knows the law. Or they may have meant that they did not find from the evidence that the plaintiff knew that no permit had been issued. Either interpretation is permissible within the rule requiring great liberality of construction to avoid inconsistency between the findings and the verdict. "All of the findings are to be considered together, and, if possible, are to be construed so as to harmonize them and uphold the verdict." (*Kansas City v. Slangstrom*, 53 Kan. 431, 439, 36 Pac. 706.)

6. The plaintiff also asserts that a fatal inconsistency appears from the following questions and answers:

"6. Was S. F. Stewart a holder in due course of the first note given by the defendant to Thompson & Krouse? A. No.

"7. If you answer Question No. 6 in the negative, state whether the said note was endorsed to S. F. Stewart before it was due? A. We do not know.

"8. If you answer Question No. 6 in the negative, state whether S. F. Stewart had notice of any infirmity in said note? A. Yes.

"9. If you answer Question No. 8 in the affirmative, state what facts were known by S. F. Stewart which constituted infirmity in said note. A. He received note after maturity."

It is quite apparent that by their answer to the 7th question the jury meant that they did not know when the writing was placed on

Weisendanger v. Lind.

the back of the note, distinguishing between that act, which they treated as the indorsement, and the delivery of the note to the plaintiff, which completed its negotiation. Whether the distinction was in accordance with approved usage is quite immaterial. It may be noted however that the statute reads: "If [the note is] payable to bearer, it is negotiated by delivery; if payable to order, it is negotiated by the indorsement of the holder completed by delivery." (Gen. Stat. 1915, § 6557.)

7. The plaintiff contends that there was no evidence to sustain the answers to questions 11 and 12:

"11. Do you find from the evidence that the plaintiff received any consideration whatsoever as an agent of Thompson & Krouse in the sale of Fawley Royalty to defendant? A. Yes.

"12. If you answer Question No. 11 in the affirmative, what consideration do you find from the evidence that said plaintiff received from Thompson and Krouse? A. Oil Royalty units."

There was no direct testimony that the plaintiff acted as the agent of Thompson & Krouse in the sale of the royalty interest to the defendant, or that he received any compensation from them for his services in that connection. The evidence however tended to show these facts:

Stewart was the owner of an interest in the royalty under an oil and gas-lease executed by one Fawley on an 80-acre tract in Butler county. He assigned it to the Guaranty Title & Trust Company in trust for himself and assigns, the assignment providing for its issuance of certificates of ownership covering 5,000 units. Various persons sold units for Thompson & Krouse, paying $10 a unit and retaining whatever they could get in excess of that sum, sometimes amounting to as much as $15. They spoke of the transaction as buying for $10 and selling for $20 or more. One of them testified that the arrangement was "that I would take a guy and sell him or take him in to buy units, and if he would come in there, and I was the instigator, I would get my share. If it sold for $20, I got $10." The trust company issued a certificate for 3,206 units to Stewart, who held it as collateral security for obligations of Thompson & Krouse, and units that they sold were issued out of this number by the trust company, a new certificate for the remainder being issued to Stewart. The plaintiff in June, 1919, bought about 400 units, some of which he sold at $20. On the evening of June 5 Lind said

34—114 Kan.

to him: "Now when the boys—Thompson and Krouse—put up another royalty, and you think it is a good one, why, you let me know about it." The plaintiff told him they were putting on another royalty which he thought was a good purchase, and promised to keep him informed about it. He advised him to get in on it. A little later he told Lind the boys were going to raise their units from $20 to $25 and if he wanted to buy it would probably be a good time to do it. He was in the room when Thompson was making the sale to Lind and heard part of the conversation. When he sold units he would send the certificates to the trust company with instructions to issue a certificate to the purchaser and one for the balance to him. He drove with Thompson to another town and helped him to make a sale of units there; he testified "he only interested himself in the deal as a kindly act." (The foregoing so far as it relates to the plaintiff is from his own testimony.) Referring to the purchase of oil royalty the plaintiff told the defendant in May that he had a man down there and would keep posted and let him know. Early in June the plaintiff called the defendant by telephone and asked him to come down to the hotel. The defendant did so, and on meeting the plaintiff asked what he had. The plaintiff answered, "We've got the Fawley royalty, right near the Eyestone." At that time the Eyestone was a gusher. They then went into a room to look at a blue print showing the location. Thompson was there and either he or the plaintiff assured the defendant that material was on the ground or *en route,* and that drilling operations would commence immediately. Another investor, who bought $1,000 worth of Fawley royalty from Thompson, was introduced to him by the plaintiff. The plaintiff testified that his principal business was trading; that he bought and traded for about 400 units of Fawley royalty on the 5th or 6th of June, 1919; that he never bought any from Thompson & Krouse for less than $20; that "I sold the units at Randolph [referring to 25 or 30 sold there] at $20, making my profit on the automobiles and notes traded;" that he traded 200 units of Fawley royalty to one person at $30 a unit; that he did not know where he got the block of 200 that he delivered to Thompson in the trade by which he obtained the $4,000 Lind note; that prior to Lind's purchase of Fawley royalty Lind had bought Eyestone royalty of another person, to whom the plaintiff later said that Lind could have saved money by buying it from him, adding, "Told him that Mr.

Lind was my man." The plaintiff also testified, "Did not sell him [Lind] my units [of Fawley royalty] because I was not figuring on putting any out for sale."

We think this evidence gave room for the jury to infer that the plaintiff aided Thompson in making the sale to the defendant, and that it was done as a matter of business and not as a mere accommodation, compensation being received in some form. Whether it could also be reasonably inferred that the plaintiff received royalty units in consideration for his services may be doubtful, but in any event the finding on that point is immaterial and could not vitiate the verdict even if not sustained by the evidence.

The judgment is affirmed.

JOHNSTON, C. J., not sitting.